IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆◆

KEVIN COTTINGIM,

*Plaintiff-Appellant,*

—v.—

RELIASTAR LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

## BRIEF FOR PLAINTIFF-APPELLANT

JEREL C. DAWSON
STEPHEN JESSUP
ATTORNEYS DELL & SCHAEFER
  CHARTERED
2625 Weston Road
Weston, Florida 33331
(954) 620-8300

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, Appellant certifies that the following individuals and entities have an interest in the outcome of this appeal:

Attorneys Dell & Schaefer, Chartered

Stephen F. Jessup

Jerel C. Dawson

Gregory M. Dell

Kevin Cottingim

Hon. Charlene Honeywell (District Court Judge)

ReliaStar Life Insurance Company

McDowell Heatherington, LP

Wendy Furman

Danielle Ploshnick

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant respectfully requests oral argument, as this appeal involves significant issues with respect to disability benefits determinations pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). The Appellant contends that, for reasons explained in the "Argument and Citations of Authority" section of this Brief, the Appellee's disposition of the Appellant's claim for disability benefits and the district court's affirmance of that disposition were contrary to important federal policies underlying ERISA. The Appellant therefore respectfully submits that oral argument would assist this Court's adjudication of the appeal.

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PERSONS
    AND CORPORATE DISCLOSURE STATEMENT................... C-1

STATEMENT REGARDING ORAL ARGUMENT ........................... i

TABLE OF AUTHORITIES .................................................... iv

STATEMENT OF JURISDICTION ........................................... x

STATEMENT OF THE ISSUES................................................ 1

STATEMENT OF THE CASE.................................................. 1

    Course of Proceedings And Disposition Below........................... 2

    Statement of the Facts.................................................... 2

    Standard of Review...................................................... 18

SUMMARY OF THE ARGUMENT ......................................... 18

ARGUMENT AND CITATIONS OF AUTHORITY ........................ 20

   I.   This Court Should Deem Cottingim Entitled to LTD Benefits ..... 24

      A. This Court Should Not Consider ReliaStar's Post Hoc
         Rationales for Denying Cottingim's LTD Claim ................. 25

      B. ReliaStar's LTD Claim Decision Was "*De Novo* Wrong." ...... 32

        (i)  The Evidence from Cottingim's Work Supervisor and
            Colleague Supports his Disability and Should be Fully
            Credited ......................................................... 36

        (ii) Other Evidence Overwhelmingly Establishes
            Disability...................................................... 40

      C. Alternatively, ReliaStar's Post Hoc Rationales Should be
         Rejected as Meritless............................................... 45

D. ReliaStar Did Not Have Discretionary Authority, thus Necessitating Reversal of the LTD Claim Denial ................ 48

E. An Award of LTD Benefits is the Appropriate Remedy ......... 50

II. The Court Should Deem Cottingim Entitled to STD Benefits ...... 51

CONCLUSION ................................................................. 52

CERTIFICATE OF COMPLIANCE ........................................... 53

CERTIFICATE OF SERVICE ................................................ 54

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*,
    833 F.3d 1299 (11th Cir. 2016) ............................................... 22

*Bard v. Boston Shipping Ass'n*,
    471 F.3d 229 (1st Cir. 2006) ................................................. 25

*Billings v. Unum Life Ins. Co. of Am.*,
    459 F.3d 1088 (11th Cir. 2006) .............................................. 50

*Black & Decker Disab. Plan v. Nord*,
    538 U.S. 822, 123 S.Ct. 1965 (2003) ................................. 20, 42

*Blankenship v. Metro. Life Ins. Co.*,
    644 F.3d 1350 (11th Cir. 2011) ................................... 23, 48, 50

*Blue Cross & Blue Shield of Ala. v. Sanders*,
    138 F.3d 1347 (11th Cir. 1998) .............................................. 21

*Brown v. Unum Life Ins. Co. of Am.*,
    356 F. Supp.3d 949 (C.D. Cal. 2019) ....................................... 42

*Buce v. Allianz Life Ins. Co.*,
    247 F.3d 1133 (11th Cir. 2001) .............................................. 48

*Capone v. Aetna Life Ins. Co.*,
    592 F.3d 1189 (11th Cir. 2010) .............................................. 21

*Castanon v. UPS/IBT Full-Time Emp. Pen. Plan*,
    No. 1:16-cv-621, 2017 WL 4863238 (N.D. Ga., Aug. 4, 2017) ......... 27

*Chapin v. Prudential Ins. Co. of Am.*,
    No. 2:19-cv-1256, 2021 WL 1090749
    (W.D. Wash., Mar. 22, 2021) ................................................. 41

*CIGNA Corp. v. Amara*,
    563 U.S. 421, 131 S.Ct. 1866 (2011) ....................................... 49

*Cinelli v. Sec. Pacific Corp.*,
    61 F.3d 1437 (9th Cir. 1995) ................................................. 39

*Collier v. Lincoln Life Assur. Co. of Boston*,
    53 F.4th 1180 (9th Cir. 2022) .......................................... 26, 31

*Curtis v. Metro. Life Ins. Co.*,
    No. 3:15-cv-2328, 2016 WL 2346739 (N.D. Tex., May 4, 2016) ....... 48

*DaimlerChrysler Corp. Healthcare Ben. Plan v. Durden*,
    448 F.3d 918 (6th Cir. 2006) ............................................ 48

*Doyle v. Nationwide Ins. Companies & Affiliates Emp. Health Care Plan*,
    240 F. Supp.2d 328 (E.D. Pa. 2003) .................................... 32

*Dunn v. Saul*,
    794 F. App'x 519 (7th Cir. 2019) ....................................... 43

*Ertel v. Saul*,
    No. 18-9603, 2019 WL 3947092 (C.D. Cal., Aug. 21, 2019) .......... 43

*Ferrin v. Aetna Life Ins. Co.*,
    336 F. Supp.3d 910 (N.D. Ill. 2018) ................................... 49

*Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*,
    41 F.3d 1476 (11th Cir. 1995) .......................................... 39

*Gable v. Sweetheart Cup Co.*,
    35 F.3d 851 (4th Cir. 1994) ............................................ 39

*Glista v. Unum Life Ins. Co. of Am.*,
    378 F.3d 113 (1st Cir. 2004) ........................................... 31

*Gross v. Sun Life Assur. Co. of Canada*,
    734 F.3d 1 (1st Cir. 2014) ............................................. 36

*Harris v. Lincoln Nat. Life Ins. Co.*,
    42 F.4th 1292 (11th Cir. 2022) ......................................... 28

*Hauser v. Life Gen. Sec. Ins. Co.*,
    56 F.3d 1330 (11th Cir. 1995) .......................................... 22

*Hawkins v. First Union Corp. LTD Plan*,
    326 F.3d 914 (7th Cir. 2003) ........................................... 44

*Henglein v. Colt Indus. Operating Corp.*,
    260 F.3d 201 (3d Cir. 2001) ............................................ 39

*Herman v. Hartford Life and Acc. Ins. Co.*,
508 F. App'x 923 (11th Cir. 2013)..................................... 23

*Kaviani v. Reliance Standard Life Ins. Co.*,
799 F. App'x 753 (11th Cir. 2020)........................... 36, 44, 45

*King v. Hartford Life and Acc. Ins. Co.*,
414 F.3d 994 (8th Cir. 2005) ............................................ 32

*Knox v. United of Omaha Life Ins. Co.*,
357 F. Supp.3d 1265 (N.D. Ga. 2019) ................................... 37

*Landeck v. Unum Life Ins. Co. of Am.*,
No. 17-cv-3157, 2018 WL 11472373
(N.D. Cal., Oct. 15, 2018) ......................................... 33, 37

*Lauder v. First Unum Life Ins. Co.*,
284 F.3d 375 (2d Cir. 2002) ......................................... 31, 32

*Learn v. Lincoln Nat. Life Ins. Co.*,
--- F. Supp.3d ---, No. 6:20-cv-60, 2024 WL 1183676
(W.D. Va., Mar. 19, 2024)................................................ 38

*Lesser v. Reliance Standard Life Ins. Co.*,
385 F. Supp.2d 1356 (N.D. Ga. 2019) ............................... 27, 33

*Mack v. Metro. Life Ins. Co.*,
246 F. App'x 594 (11th Cir. 2007)................................... 45, 46

*Meadows v. Cagle's, Inc.*,
954 F.2d 686 (11th Cir. 1992)........................................... 39

*Miller v. Am. Airlines, Inc.*,
632 F.3d 837 (3d Cir. 2011) ............................................ 25

*Mindt v. Prudential Ins. Co. of Am.*,
322 F. Supp.2d 1150 (D. Or. 2004) ..................................... 40

*Moorman v. UnumProvident Corp.*,
464 F.3d 1260 (11th Cir. 2006) ......................................... 21

*Morris v. Crow*,
117 F.3d 449 (11th Cir. 1997)........................................... 18

*Murphy v. Cal. Physicians Serv.*,
No. 14-cv-2581, 2017 WL 1330636
(N.D. Cal., Apr. 11, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Nebesny-Fender v. Am. Airlines, Inc.*,
818 F. Supp.2d 1319 (S.D. Fla. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Newsom v. Reliance Standard Life Ins. Co.*,
26 F.4th 329 (5th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*O.D. v. Jones Lang LaSalle Medical PPO Plus Plan*,
772 F. App'x 800 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Oliver v. Aetna Life Ins. Co.*,
55 F. Supp.3d 1370 (N.D. Ala. 2014), *aff'd*,
613 F. App'x 892 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Paese v. Hartford Life and Acc. Ins. Co.*,
449 F.3d 435 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Perryman v. Provident Life and Acc. Ins. Co.*,
690 F. Supp.2d 917 (D. Ariz. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Pike v. Caldera*,
188 F.R.D. 519 (S.D. Ind. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Prichard v. Metro. Life Ins. Co.*,
783 F.3d 1166 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Saffle v. Sierra Pacific Power Co. Bargaining Unit LTD Plan*,
85 F.3d 455 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Sanborn v. Comm'r of Soc. Sec.*,
No. 16-4408, 2017 WL 4842373 (D.N.J., Oct. 25, 2017) . . . . . . . . . . . . . . . 43

*Schwarzwaelder v. Merrill Lynch & Co., Inc.*,
606 F. Supp.2d 546 (W.D. Pa. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Scippio v. Fla. Combined Life Ins. Co.*,
585 F. Supp.2d 1317 (N.D. Fla. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Seitz v. Metro. Life Ins. Co.*,
433 F.3d 647 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Seitz v. Metro. Life Ins. Co.*,
  No. C-04-1003, 2005 WL 715932 (N.D. Iowa, Mar. 30, 2005),
  *rev'd on other grounds*, 433 F.3d 647 (8th Cir. 2006) .................. 47

*Sellers v. Zurich Am. Ins. Co.*,
  615 F. Supp.2d 816 (E.D. Wis. 2009) ..................................... 30

*Smith v. Cox Enterprises, Inc.*,
  81 F. Supp.3d 1366 (N.D. Ga. 2015) ..................................... 23

*Spradley v. Owens-Illinois Hourly Employees Welfare Ben. Plan*,
  686 F.3d 1135 (10th Cir. 2012) ............................. 26, 32, 50, 51

*Talasek v. Unum Life Ins. Co. of Am.*,
  No. 4:18-cv-3306, 2020 WL 7775450 (S.D. Tex., Dec. 15, 2020) ...... 48

*Tippitt v. Reliance Standard Life Ins. Co.*,
  276 F. App'x 912 (11th Cir. 2008) ........................................ 27

*U.S. v. Watkins*,
  10 F.4th 1179 (11th Cir. 2021) ............................................ 23

*Walke v. Group LTD Ins.*,
  256 F.3d 835 (8th Cir. 2001) .............................................. 47

*Williams v. BellSouth Telecom., Inc.*,
  373 F.3d 1132 (11th Cir. 2004) ................................. 22, 23, 48

*Zurndorfer v. Unum Life Ins. Co. of Am.*,
  543 F. Supp.2d 242 (S.D.N.Y. 2008) ..................................... 38

**Statutes**

29 U.S.C. § 1001 *et seq.*, Employee Retirement Income Security Act
  of 1974 ("ERISA") .. 1, 18, 19, 20, 21, 22, 23, 25, 26, 30, 31, 36, 37, 38,
  39, 40, 42, 44, 48, 49, 51

29 U.S.C. § 1132(a)(1)(B)................................................. 21

29 U.S.C. § 1132(g)(1) ................................................... 51

29 U.S.C. § 1133 ......................................................... 25

29 U.S.C. § 1133(1)....................................................... 25

29 U.S.C. § 1133(2)....................................................... 25

**Regulations**

29 C.F.R. § 2560.503-1(j)(1)-(2) ............................................... 26

**Other Authorities**

Diagnostic and Statistical Manual of Mental Disorders, 5th Edition
    ("DSM-5") ................................................................. 43

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction because Plaintiff/Appellant, as a participant in an employee welfare benefit plan, brought suit to recover plan benefits pursuant to § 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"). The cause of action was created by federal law, and, therefore, federal question jurisdiction existed pursuant to 28 U.S.C. § 1331. After the district court entered summary judgment in favor of Defendant/Appellee on March 18, 2024, Plaintiff/Appellant timely filed his Notice of Appeal in the district court. This appeal is from a final judgment that disposed of all parties' claims, and, therefore, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the district court erred in entering summary judgment in favor of the Appellee on the Appellant's claim for long-term disability ("LTD") benefits.

Whether the district court erred in denying the Appellant's motion for summary judgment on his claim for LTD benefits.

Whether the district court erred in affirming the denial of the Appellant's claim for LTD benefits.

Whether the district court erred in entering summary judgment in favor of the Appellee on the Appellant's claim for short-term disability ("STD") benefits.

Whether the district court erred in denying the Appellant's motion for summary judgment on his claim for STD benefits.

Whether the district court erred in affirming the denial of the Appellant's claim for STD benefits.

## STATEMENT OF THE CASE

Plaintiff/Appellant, Kevin Cottingim ("Cottingim"), appeals the district court's disposition of the parties' cross-motions for summary judgment under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"). Cottingim, as he did in the district court action, seeks judicial reversal of the decisions of Defendant/Appellee, ReliaStar Life Insurance Company ("ReliaStar"), as a claim administrator for an employee benefit plan, to deny his

claims for short-term disability ("STD") and long-term disability ("LTD") benefits, respectively.

## Course of Proceedings and Disposition Below

Cottingim brought suit in the district court on May 27, 2022, seeking reversal of ReliaStar's STD and LTD claim determinations. (DE 1.) The parties filed cross-motions for summary judgment (DE 31, 32) on March 10, 2023. The district court adjudicated the cross-motions on March 18, 2024 (DE 50), denying Cottingim's motion, granting ReliaStar's motion, and affirming the claim decisions.

## Statement of the Facts

Cottingim, as an employee of EmployBridge, LLC ("EBL"), had STD coverage through an employee benefit plan sponsored by EBL (the "STD Plan"). (DE 1, pg. 1-3, ¶¶ 2, 4, 7; DE 9, pg. 1-3, ¶¶ 2, 4, 7.) Benefits under the STD Plan were provided through a group insurance policy issued to EBL by ReliaStar (the "STD Policy"). (DE 1, pg. 1-2, ¶ 2; DE 9, pg. 1-2, ¶ 2; DE 22-1, pg. 1-23.)

The STD Policy conditions weekly benefits (up to a maximum of 26 weeks) on the employee's inability to perform the essential duties of his or her "regular occupation," defined as "the activity which, immediately prior to disability, you were regularly performing and which was your source of income from the Policyholder." (DE 22-1, pg.12, 22-23.) The STD Policy states that ReliaStar will assess a claimant's regular occupation as it is "normally performed in the national economy." (*Id.*, pg. 23.)

Cottingim also had LTD coverage through a benefit plan sponsored by EBL (the "LTD Plan"). (DE 1, pg. 1-3, ¶¶ 2, 4, 7; DE 9, pg. 1-3, ¶¶ 2, 4, 7.) Benefits under the LTD Plan were provided through a group insurance policy issued to EBL by ReliaStar (the "LTD Policy"). (DE 1, pg. 1-2, ¶ 2; DE 9, pg. 1-2, ¶ 2; DE 22-1, pg. 764-800.)

The LTD Policy conditions monthly benefits on the claimant's disability, as defined in the policy, through and beyond the 180-day elimination period. (*Id.*, pg. 779, 789.)

The LTD Policy contains the following definition of disability:

> **DEFINITION OF DISABILITY**
> **You** are considered disabled when **we** review **your** claim and determine that, due to **your sickness** or **injury**, both of the following are true:
> - **You** are unable to perform all the **material and substantial duties** of **your regular occupation**.
> - **You** have a 20% or more loss in **your indexed monthly earnings**.
>
> The loss of a professional or an occupational license or certification does not, in itself, constitute disability.
>
> **You** must be under the **appropriate care** of a **doctor** in order to be considered disabled.
> **We** may require **you** to be examined by one or more **doctors**, other medical practitioners or vocational experts of our choice. **We** will pay for this examination. **We** can require an examination as often as it is reasonable to do so. **We** may also require **you** to be interviewed by **our** authorized representative. Your failure to comply with this request may result in denial or termination of benefits.

(DE 22-1, pg. 789) (emphasis in original).

The LTD Policy defines "regular occupation" as "the occupation you are routinely performing when your disability begins," as it is "normally performed in the national economy." (DE 22-1, pg. 784.)

The term "appropriate care" is defined thusly in the following provision of the LTD Policy (the "Appropriate Care Provision"):

> **APPROPRIATE CARE** means that all of the following are true:
> - **You** visit a **doctor** as frequently as medically required according to standard medical practice to effectively treat and manage **your** disabling condition(s).
> - **You** receive care or treatment appropriate for the disabling conditions(s), conforming with standard medical practice, by a **doctor** whose specialty or experience is appropriate for the disabling condition(s), according to standard medical practice.
> - **You** have the obligation to minimize **your** disabling condition including having corrective treatment or minor surgery.

(DE 22-1, pg. 782) (emphasis in original).

Benefits under the LTD Policy are payable to a claimant of Cottingim's age (63 at the time his disability began) for a maximum total of 36 months. (DE 22-1, pg. 780.) The LTD Policy further provides that benefits for "disabilities due to alcoholism" are limited to a maximum total of 24 months. (*Id*., pg. 794.)

Before becoming disabled, Cottingim was employed by EBL, an industrial staffing company, as a Vice President of Human Resources. (DE 22-1, pg. 55.) According to EBL's position outline, his responsibilities included, among other things: (a) oversight of human resources administration, (b) handling exit issues for

4

3,500 employees of EBL, (c) compliance with background check requirements, (c) compliance with affirmative action requirements, (d) handling benefits issues for employees, and (e) designing and overseeing medical benefit plans for temporary workers placed with client companies by EBL. (*Id.*) Cottingim's position required extensive knowledge of employment law matters and information technology, as well as a "strong quantitative orientation." (*Id.*)

In the course of administering Cottingim's disability claims, ReliaStar retained a vocational consultant, Mary O'Malley, to perform an Occupational Analysis. (DE 22-1, 374-382.) The purpose of the Occupational Analysis was to "identify [Cottingim's] occupation and … determine how it is normally performed in the national economy." (*Id.*, pg. 374.) Utilizing the Economic Research Institute's Occupational Assessor, Ms. O'Malley determined that Cottingim's regular occupation was "Vice President, Human Resources." (*Id.*, pg. 376.) With respect to the cognitive demands of Cottingim's occupation, Ms. O'Malley reported the following:

    (a) Cottingim's occupation required "high" levels of general learning aptitude, verbal aptitude, and numeric aptitude. (*Id.*, pg. 379.)

    (b) The "Very Important" abilities and skills of Cottingim's occupation included "management of personnel resources, speaking, judgment and decision making, reading comprehension, complex problem solving, coordination,

negotiation, social perceptiveness, … active learning, critical thinking, system evaluation and analysis, monitoring, persuasion, time management, and instructing," as well as "oral and written comprehension and expression, deductive and inductive reasoning … and fluency of ideas." (*Id.*, pg. 376.)

(c) The occupation "frequently" required "understanding and remembering detailed instructions" and "maintenance of concentration and attention for extended periods." (*Id.*, pg. 381.)

(d) The reasoning skills required by the occupation included the ability to (*i*) "apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions," (*ii*) "interpret an extensive variety of technical instructions," and (*iii*) deal with "abstract and concrete variables." (*Id.*, pg. 380.)

(e) The occupation required "frequent changes of tasks involving different aptitudes, technologies, procedures … or degrees of attentiveness without loss of efficiency or composure." (*Id*., pg. 382.)

On October 11, 2019, while still in active employment, Cottingim underwent a neuropsychological evaluation administered by Michele York, Ph.D., a board certified neuropsychologist and an Associate Professor of Neurology at Baylor School of Medicine. (DE 22-1, pg. 655.) Cottingim was referred for this evaluation by neurologist Greg McLauchlin, M.D., for the purpose of "informing medical

differential diagnosis and facilitating clinical decision making." (*Id.*; DE 22-1, pg. 482.) Cottingim described experiencing "increased forgetfulness in the past year, characterized by forgetting recent conversations, appointments/meetings, difficulty multi-tasking, increased distractibility, and occasional word finding difficulties." (DE 22-1, pg. 655.) After administering a battery of cognitive tests, Dr. York observed that Cottingim had "performed within the broadly average range on the majority of measures administered." (*Id.*, pg. 658.) Cottingim's current full scale IQ was estimated to be 109, *i.e.*, in the "average" range. (*Id.*, pg. 657.) According to Dr. York, the test results were "consistent with Mild Neurocognitive Disorder characterized by modest cognitive decline in the areas of complex attention, processing speed and executive functions." (*Id.*, pg. 658.) Dr. York further opined that Cottingim's "current cognitive pattern is most consistent with a vascular etiology." (*Id.*) Finally, the neuropsychologist commented that Cottingim's "history of heavy alcohol use and his current alcohol intake, which is reduced but remains heavy, may be negatively affecting his cognitive functioning." (*Id.*)

On June 29, 2020, Cottingim was seen by David Hunter, M.D., an Assistant Professor of Neurology at the University of Texas Health Science Center. (DE 22-1, pg. 558, 611-616.) Cottingim described "worsening symptoms" of forgetfulness and inability to concentrate, and related that his workplace superiors had expressed concern about his performance. (*Id.*, pg. 611.)

Cottingim underwent another neuropsychological evaluation on July 30, 2020, administered by Darci Morgan, Ph.D. (DE 22-1, pg. 648-652.) Although the "majority of his test scores were within normal limits," there was evidence of a possible "decline from his premorbid level of functioning." (*Id.*, pg. 651.)

On August 5, 2020, Dr. Hunter completed an Attending Physician's Statement ("APS") form that had been provided to Cottingim by ReliaStar. (DE 22-1, pg. 662-64.) Asked to identify Cottingim's diagnosis, Dr. Hunter stated "memory loss" but clarified that the underlying medical diagnosis was still being evaluated. (*Id*., pg. 662.) Further answering the questions on the APS form, Dr. Hunter certified that Cottingim had no physical restrictions in the areas of lifting, bending, sitting, standing, climbing, reaching, squatting, or crawling. (*Id.*, pg. 664.) Dr. Hunter further confirmed that Cottingim had fully functional upper extremities, and that he did not have a mental health condition. (*Id.*) The APS form did not seek any information regarding the claimant's cognitive abilities or impairments. (*Id.*)

Cottingim ceased work as of August 18, 2020 and subsequently applied for STD and LTD benefits. (DE 22-1, pg. 30-31.) At the time he ceased work, he had been a Vice President of Human Resources for approximately 4.5 years. (*Id.*, pg. 72.) His medical history included Type 1 diabetes, coronary artery disease, and hypertension. (*Id.*, pg. 673.)

On August 24, 2020, Cottingim submitted to ReliaStar a report of a General Intelligence Assessment dated April 13, 2018, showing that his overall intellectual abilities were at that time in the "top 14% of the norm range." (DE 22-1, pg. 564.) This percentile -- the result of a "weighted combination of Perceptual Speed, Number Speed & Accuracy, Reasoning, Word Meaning and Spatial Visualization" -- indicated that Cottingim would be "extremely quick" to "process new information" and "acquire new skills and abilities." (*Id*.)

On September 10, 2020, Cottingim forwarded to ReliaStar an e-mail from treating neurologist Hunter, who stated that Cottingim was cognitively "impaired" following his "decline from superior to average" cognition. (DE 22-1, pg. 573.)

In correspondence dated September 18, 2020, Sherry Roy, a registered nurse and a Senior Clinical Consultant for ReliaStar, informed Dr. Hunter that in her view, the medical evidence did not support functional impairment from a "physical perspective" or a "behavioral health perspective." (DE 23-1, pg. 566.) Ms. Roy then asked Dr. Hunter to provide further information if he disagreed with her assessment. (*Id*.)

Dr. Hunter responded to Ms. Roy's request via letter dated October 28, 2020. (DE 22-1, pg. 556-558.) Agreeing with Ms. Roy that Cottingim had no physical or motor deficits, Dr. Hunter described himself as "disappointed that your disability forms did not have more of a focus on cognition." (*Id.*, pg. 556.) Dr. Hunter opined

that Cottingim was in fact "disabled, for neurological reasons." (*Id.*) More specifically, Dr. Hunter advised that Cottingim had "*mild cognitive impairment due to brain damage from both vascular disease and alcohol dependence*." (*Id.*, pg. 557) (emphasis in original). According to Dr. Hunter, a brain MRI from August 2019 was "definitive evidence" of a "neurological impairment," as it revealed "small vessel ischemic disease" characterized by "hundreds of tiny cerebral infarcts." (*Id.*) These infarcts, he explained, acted to "compromise attention, concentration, and processing speed." (*Id.*) In Dr. Hunter's view, Cottingim was "no longer capable of the multitasking, memory, and planning required by an office job." (*Id.*)

In the same letter, Dr. Hunter advised ReliaStar that Cottingim's cognition was expected to "further worsen over time." (*Id.*) Although Dr. Hunter recommended that Cottingim stop drinking, he emphasized that "sobriety will not restore [Cottingim's] cognitive impairments." (*Id.*) Indeed, due to Cottingim's "permanent" brain damage, his condition would not improve "even with perfect risk factor control going forward." (*Id.*)

Also submitted to ReliaStar was a letter from Paul Galleberg, EBL's Chief Operating Officer and Cottingim's "direct supervisor" for approximately four years from April 2016 until June 2020. (DE 22-1, pg. 561.) Mr. Galleberg described a "decline in [Cottingim's] work performance" during his last eighteen months of employment, due largely to chronic memory issues. (*Id.*) Mr. Galleberg advised that

he had begun requiring Cottingim to take notes during meetings and repeat things back to Mr. Galleberg. (*Id.*) Mr. Galleberg also required Cottingim to bring his notes to subsequent meetings. (*Id.*) Cottingim's work performance nevertheless "continued to decline below the levels he had previously shown," with the result that he was "no longer able to effectively accomplish the job he was hired to do." (*Id.*)

In another letter, Michael Baer, EBL's Chief Development Officer, advised ReliaStar that he and Cottingim had "worked very closely together for five years." (DE 22-1, pg. 562.) Prior to 2019, Mr. Baer related, Cottingim had been "quick, responsive, detailed, [and] thorough," and had "delivered on assignments … with speed and excellence." (*Id.*) Over time, however, Mr. Baer "personally noticed [Cottingim's] memory lapses, failure to deliver on time or at all, confusion, withdrawal from conversations, and, at times, simply not participating." (*Id.*) Mr. Baer described Cottingim's worsening symptoms as "alarming" and "detrimental to our work." (*Id.*)

On November 20, 2020, ReliaStar denied Cottingim's STD claim on the ground that the neuropsychological evaluations administered in 2019 and 2020 did not evidence severe impairment. (DE 22-1, pg. 544-546.)

Cottingim, through counsel, appealed the STD claim denial in correspondence dated March 5, 2021. (DE 22-1, pg. 42-53.) Submitted in support of the appeal was a summary of cognitive testing administered in 2003, indicating a full scale IQ of

140 (99th percentile). (DE 22-1, pg. 57.) As stated by Robert Bender, Ph.D. -- the psychologist who administered the testing -- this score showed a "very superior level of general intellectual ability." (*Id*., pg. 58.)  Also submitted was a summary of testing subsequently administered by Dr. Bender in 2009, indicating a full scale IQ of 150 (99th percentile) that again revealed, in Dr. Bender's words, "very superior" intellectual ability. (*Id.*, pg. 64.)

Also submitted was a report of a neuropsychological evaluation of Cottingim administered on December 21-22, 2020 by Lawrence Salmansohn, Ed.D., board-certified in clinical neuropsychology. (DE 22-1, pg. 69-88.) Dr. Salmansohn noted that Cottingim's most recent employment had been in a "highly demanding position" as a "vice president of human resources." (*Id.*, pg. 84.)

Stating that tests of premorbid functioning showed Cottingim to have been "at least in the Superior range of general intellectual functioning premorbidly," Dr. Salmansohn reported that his evaluation in December 2020 had revealed "significant cognitive impairments in multiple areas," including fluid intelligence, attention/concentration, executive functioning, and memory. (DE 22-1, pg. 84, 86.) Dr. Salmansohn opined that Cottingim was now impaired by vascular dementia "to the point that he is unable to perform the … duties of his profession in the consistent and reliable manner which is demanded…." (*Id.*, pg. 86.)

Also submitted was a letter dated February 10, 2021 from Dr. Bender, noting that his 2003 and 2009 evaluations of Cottingim had indicated cognitive abilities "significantly above the 99th percentile for the general population." (DE 22-1, pg. 93.) Dr. Bender further advised that he had reviewed Dr. Salmansohn's 2020 evaluation, which showed a "very significant decline in overall intellectual functioning" including a "dramatic decline in … Performance IQ." (*Id.*, pg. 94.) These declines were, in Dr. Bender's view, consistent with "significant negative organic changes in brain physiology." (*Id.*) Dr. Bender further stated that in view of Cottingim's current "clear deficits in problem solving and memory skills," it would not be "remotely possible" for him to meet the cognitive demands of his "Vice President [of] Human Resources" position. (*Id.*, pg. 95.)

A file review was conducted at ReliaStar's request by consulting psychologist Malcolm Spica, Ph.D. (DE 22-1, pg. 310-314.) In a report dated March 29, 2021, Dr. Spica opined that Cottingim's cognition was "within normal limits" and therefore "not consistent with a debilitating disorder." (*Id.*, pg. 313.) Dr. Spica did not compare Cottingim's current cognitive abilities to the demands of his occupation.

Subsequently submitted in support of the STD appeal was a report dated April 19, 2021, from Joseph Atkinson, MS, CRC, a vocational consultant. (DE 22-1, pg. 291-295.) Mr. Atkinson advised that Cottingim's "occupation in the general

economy requires general learning ability and verbal aptitude in the extremely high range, or above the 89th percentile." (*Id*., pg. 293.) Noting that file-reviewer Spica had declared Cottingim's cognition to be "within normal limits" overall, Mr. Atkinson pointed out that Cottingim's occupation was "highly skilled and requires well above average aptitude in various cognitive areas." (*Id.*, pg. 294-295.)

On June 11, 2021, a neuropsychological evaluation was administered at ReliaStar's request by James Boone, Ph.D. (DE 22-1, pg. 219-238.) Dr. Boone reported that Cottingim performed in the "Average" range on the majority of tests, with some at the "Low Average" or "High Average" level. (*Id*., pg. 226-228.) Dr. Boone also opined that Cottingim's premorbid functioning was "likely in the Average range." (*Id.*, pg. 230.)

Dr. Boone's report was supplied to file-reviewer Spica, who advised that Cottingim's cognition was "within normal limits." (DE 22-1, pg. 211.) Dr. Spica did not compare Cottingim's current cognitive abilities to the demands of his occupation.

Dr. Boone's report was also reviewed by neuropsychologist Salmansohn, who in a letter dated July 18, 2021 disagreed with Dr. Boone's assessment of Cottingim's premorbid functioning as having been average. (DE 22-1, pg. 182-188.) Simply using "common sense," Dr. Salmansohn asked, would one really "expect a senior

vice president with two Master's degrees … to be of average intelligence?"[1] (*Id.*, pg. 185.)

On July 26, 2021, Cottingim submitted to ReliaStar a report of a Stanford-Binet Intelligence Test administered in 1974 when he was 16 years old. (DE 22-1, 177-178.) His IQ was reported to be 135. (*Id.*, pg. 178.) The examiner stated that Cottingim was "classified in the superior range as 99% of the population fall below him." (*Id.*)

On August 24, 2021, ReliaStar notified Cottingim that it was upholding on appeal the denial of his STD claim. (DE 22-1, pg. 152-157.) Relying largely on Dr. Spica's file-review report, ReliaStar explained that Cottingim's scores on Dr. Boone's cognitive testing were "within normal limits." (*Id.*, pg. 156.) ReliaStar did not compare Cottingim's current cognitive abilities to the demands of his occupation.

In correspondence dated August 27, 2021, ReliaStar notified Cottingim of the denial of his LTD claim. (DE 23-1, pg. 290-293.) Set forth at the outset of the letter was the LTD Policy's "DEFINITION OF DISABILITY," in its entirety. (*Id.*, pg. 290.) Again relying on file-reviewer Spica, ReliaStar explained that Cottingim's scores on Dr. Boone's evaluation were "within normal limits," meaning Cottingim did not have a "debilitating neurocognitive disorder." (*Id.*, pg. 291-292.) ReliaStar

---

[1]     Cottingim holds an MBA as well as a master's degree in psychology. (DE 22-1, pg. 72.)

did not compare Cottingim's current cognitive abilities to the demands of his occupation. (*Id*.)

Although ReliaStar's LTD denial letter reproduced the LTD Policy's disability definition, which contains a reference to "appropriate care," the letter **did not include the Appropriate Care Provision.** (DE 23-1, pg. 290-293.) Furthermore, the letter made **no other mention of the Appropriate Care Provision**. (*Id*.) The letter also made **no mention of any medical recommendations that Cottingim cease or reduce his alcohol consumption**. (*Id*.) At the conclusion of the letter, ReliaStar informed Cottingim of his right to appeal the decision, and advised him as follows:

> **As you have read, this letter explains clearly, using <u>specific facts</u>, the <u>precise reasons</u> for the decision on your claim. If you disagree with that decision and decide to request a review of that decision, please provide information and/or documents which responds to each of <u>these reasons</u> for the decision. Your request for review should explain why you believe each of <u>these reasons</u> is without merit and why this claim decision should be overturned.**

(DE 23-1, pg. 292) (bold type and underscoring added).

Cottingim appealed the LTD denial decision on December 14, 2021, re-submitting medical documentation that had supported his STD claim. (DE 23-1, pg. 181-263.)

In a file-review report dated January 10, 2022, consulting psychologist Staci Ross, Ph.D. advised ReliaStar that Cottingim was "likely demonstrating a possible neurocognitive disorder" that was "consistent with [his] history of small vessel ischemic disease." (DE 23-1, pg. 136.) Dr. Ross nevertheless concluded that because Cottingim's recent neuropsychological evaluations were "generally within the average range," his condition was not "functionally impairing." (*Id.*, pg. 139.) Dr. Ross did not compare Cottingim's current cognitive abilities to his occupational responsibilities.

On February 8, 2022, ReliaStar notified Cottingim of the decision to uphold on appeal the denial of his LTD claim. (DE 23-1, pg. 81-84.) Relying on file-reviewer Ross' determination that Cottingim's recent neuropsychological test scores were "within the average range," ReliaStar stated there was "no support" for a disabling cognitive impairment. (*Id.*, pg. 83.) ReliaStar did not compare Cottingim's current cognitive abilities to the demands of his occupation. Although ReliaStar's letter reproduced the LTD Policy's disability definition, which contains a reference to "appropriate care," the letter did not include the Appropriate Care Provision. (DE 22-1, pg. 290-293.) Furthermore, the letter made no other mention of the Appropriate Care Provision. (*Id.*)

On May 4, 2022, Cottingim submitted to ReliaStar office notes from neurologist Jeffrey Gelblum, M.D., stating that Cottingim had recently been

diagnosed with Alzheimer's Disease. (DE 23-1, pg. 63-70.) ReliaStar sent the new information to file-reviewer Ross, who continued to opine that Cottingim had no impairment in view of his generally average performance on the recent cognitive testing. (DE 23-1, pg. 55-58.) Dr. Ross did not compare Cottingim's current cognitive abilities to the demands of his occupation.

On May 27, 2022, ReliaStar notified Cottingim that it was again denying his LTD appeal, based on Dr. Ross's latest report. (DE 23-1, pg. 47-48.) ReliaStar did not compare Cottingim's current cognitive abilities to the demands of his occupation. (*Id.*) The company's letter made no mention of "appropriate care" or the Appropriate Care Provision. (*Id.*)

## Standard of Review

This Court reviews summary judgment rulings *de novo*, using the same legal standards applicable in the district court action. *Morris v. Crow*, 117 F.3d 449, 455 (11th Cir. 1997). In the present case, the district court conducted a *de novo* review of the challenged claim decisions.

## SUMMARY OF THE ARGUMENT

In the district court action, ReliaStar asserted new reasons for denying Cottingim's LTD claim that the company did not share with him at the time of the denial. In so doing, the company violated the letter and spirit of ERISA and its implementing regulations. The district court nevertheless considered, and agreed

with, ReliaStar's post hoc arguments in adjudicating the cross-motions for summary judgment. Because this Court makes an independent *de novo* determination of Cottingim's eligibility for LTD benefits, however, it need not consider ReliaStar's post hoc arguments in conducting that *de novo* review. Instead, it should disregard them and consider only the evidence pertaining to ReliaStar's timely stated reasons for denying the claim. That evidence establishes Cottingim's inability to perform the duties of his regular occupation, thus entitling him to LTD benefits.

Cottingim's LTD claim was premised on persistent cognitive impairment. According to ReliaStar when it denied the claim, the principal basis of the company's decision was Cottingim's generally "normal" or "average" scores on recent neurocognitive testing. What ReliaStar refused to acknowledge, however, was that Cottingim's executive-level occupation required significantly higher than average cognitive abilities. Cottingim, quite simply, experienced a steep cognitive decline across an approximately two-year period that rendered him unable to do his demanding job with adequate competence. As ERISA case law makes clear, such circumstances support a disability claim.

In deeming Cottingim ineligible for LTD benefits on *de novo* review, the district court gave no weight to two letters ReliaStar received from Cottingim's direct work superior and a close colleague, respectively. Both men, each of whom worked directly with Cottingim for years, described palpable manifestations of his

cognitive decline that they had personally observed in the workplace. The district court's refusal to credit their evidence was contrary to federal common law, which holds that such observations are competent, probative evidence in an ERISA disability case. This Court should give them substantial weight in its *de novo* review. Moreover, Cottingim's cognitive decline and resulting inability to work in his occupation are further documented by voluminous additional evidence of record. This Court should conclude its *de novo* review by determining that a preponderance of the evidence supports disability, as required for LTD benefits to be owed. The Court should therefore reverse the judgment entered below as to Cottingim's LTD claim and direct the entry of judgment in favor of Cottingim for LTD benefits. In addition, the Court should for similar reasons reverse the judgment entered below as to Cottingim's STD claim and direct the entry of judgment in favor of Cottingim for STD benefits.

## ARGUMENT AND CITATIONS OF AUTHORITY

Congress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disab. Plan v. Nord*, 538 U.S. 822, 830, 123 S.Ct. 1965 (2003) (citation omitted). For all purposes relevant to this appeal, an ERISA-governed benefit plan is a program established or maintained by an employer for the purpose of providing disability benefits (or certain other types of life and health

insurance benefits) to employees. *Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1269 (11th Cir. 2006) (citation omitted).

In a typical benefit plan arrangement, the employer contracts with an insurance company to serve as the "claim administrator" for the plan, with the insurer making claim decisions and paying benefits to eligible plan participants under the terms of a group policy issued by the insurer. *See, e.g., Newsom v. Reliance Standard Life Ins. Co.*, 26 F.4th 329, 331 (5th Cir. 2022) (noting that insurer "issued the policies that funded these [disability] benefits and served as the benefits claims administrator"). When claim administrators have "authority to make ultimate decisions regarding benefits eligibility," as ReliaStar did here, they are "fiduciaries" under ERISA. *Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F.3d 1347, 1352 n.4 (11th Cir. 1998). As such, they must discharge their duties "solely in the interest of the participants and beneficiaries and … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1199 (11th Cir. 2010) (quoting 29 U.S.C. § 1104(a)(1)).

ERISA authorizes plan participants to bring civil actions for judicial review of adverse benefits decisions by claim administrators. 29 U.S.C. § 1132(a)(1)(B). Because the statute does not include a body of contract law to govern such actions,

disputes over plan benefits are generally governed by "federal common law." *Hauser v. Life Gen. Sec. Ins. Co.*, 56 F.3d 1330, 1333 (11th Cir. 1995).

Under federal common law, a district court's decision to affirm or reverse an ERISA claim administrator's denial of benefits is reviewed *de novo*, with this Court applying "the same legal standards that governed the district court's disposition." *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1306 (11th Cir. 2016). In *Williams v. BellSouth Telecom., Inc.*, 373 F.3d 1132 (11th Cir. 2004), this Court established an analytical framework for district courts to use in "judicially reviewing virtually *all* ERISA benefit-plan denials." *Id*. at 1137 (emphasis in original). The current controlling version of the *Williams* analysis, as modified in subsequent Eleventh Circuit decisions, requires a district court to proceed as follows:

1. Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2. If the administrator's decision is in fact "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3. If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether reasonable grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) (setting forth "the present *Williams* test").

In the court's initial *de novo* review, the plaintiff bears the burden of demonstrating by a preponderance of the evidence that he or she is disabled.[2] *Paese v. Hartford Life and Acc. Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006); *Smith v. Cox Enterprises, Inc.*, 81 F. Supp.3d 1366, 1379 (N.D. Ga. 2015).

Significantly, the Federal Rules of Evidence do not apply in an ERISA benefits case. *Herman v. Hartford Life and Acc. Ins. Co.*, 508 F. App'x 923, 928 (11th Cir. 2013). The Court accordingly considers all evidence, including hearsay evidence, that was available to the claim administrator. *Id.*

---

[2]     A "preponderance of the evidence" means evidence that is "more convincing than the evidence offered in opposition to it." *U.S. v. Watkins*, 10 F.4[th] 1179, 1184 (11th Cir. 2021) (citations omitted).

# I. This Court Should Deem Cottingim Entitled to LTD Benefits.

ReliaStar's underlying theory in the district court proceeding was that Cottingim conceived and carried out an elaborate plot -- indeed a conspiracy involving multiple individuals -- to fake a cognitive disability for the purpose of fraudulently obtaining benefits. (DE 32, pg. 22-28.) Citing the "suspicious timing" of Cottingim's resignation, ReliaStar disparaged his disability claim as pure "fiction." (*Id.*, pg. 26; DE 39, pg. 19.) ReliaStar also speculated, in the alternative, that Cottingim's cognitive decline "may" have resulted from "heavy alcohol use," thus allegedly triggering the Appropriate Care Provision and precluding disability under the LTD Policy. (DE 32, pg. 28.)

Cottingim urged the district court to disregard ReliaStar's arguments concerning the timing of his LTD claim and the alleged applicability of the Appropriate Care Provision, on the ground that they were improper "post hoc" arguments that had not been previously articulated to Cottingim as required by law. (DE 38, pg. 9-14.) Cottingim argued alternatively that ReliaStar's post hoc arguments were wrong on the merits. (*Id.*, pg. 15-17.) The district court, however, considered and implicitly accepted ReliaStar's theory of a contrived claim, opining that Cottingim's medical records "appear primarily related to his making a disability claim" as opposed to legitimate care or treatment. (DE 50, pg. 35-36.) The district court also considered, and explicitly adopted, ReliaStar's belated assertion of the

Appropriate Care Provision as an additional ground for withholding benefits. (*Id.*, pg. 39-40.) For the reasons set out below, this Court should decline to consider ReliaStar's post hoc arguments, focusing instead on the evidence pertaining to ReliaStar's actual stated reasons for denying Cottingim's claim. Because the latter evidence establishes Cottingim's entitlement to LTD benefits, the judgment below should be reversed with instructions to enter judgment in his favor.

      A.    <u>This Court Should Not Consider ReliaStar's Post Hoc
Rationales for Denying Cottingim's LTD Claim.</u>

Section 503 of ERISA, codified at 29 U.S.C. § 1133, sets forth two "basic requirements governing ERISA plans." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 851 (3d Cir. 2011) (discussing Section 503). First, the statute requires an administrator to "provide adequate notice in writing to any participant … whose claim for benefits under the plan has been denied, setting forth **the specific reasons** for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1) (emphasis added). Second, the administrator must afford the participant a reasonable opportunity to appeal the adverse decision and to receive a "full and fair review" of his or her appeal. *Id*. at § 1133(2).

As the statutory text makes explicitly clear, it is essential to a full and fair review that the participant be advised exactly why their claim was denied, thus enabling a fully informed appeal. *See Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 239 (1st Cir. 2006) (observing that the "obvious purpose" of ERISA's notice

requirements is to "notify the claimant of what he or she will need to do to effectively make out a benefits claim and to take an administrative appeal from a denial"). To implement this requirement, the applicable ERISA regulation states that the administrator's claim denial letter must include "the **specific reason** for the adverse determination," as well as the "**specific plan provisions** on which the determination is based." *O.D. v. Jones Lang LaSalle Medical PPO Plus Plan*, 772 F. App'x 800, 804 (11th Cir. 2019) (emphasis added) (quoting 29 C.F.R. § 2560.503-1(g)).[3]

Because the specific reasons for denying a claim must be timely explained to the claimant, an administrator "undermines ERISA and its implementing regulations when it presents a new rationale to the district court that was not presented to the claimant as a specific reason for denying benefits during the administrative process." *Collier v. Lincoln Life Assur. Co. of Boston*, 53 F.4th 1180, 1186 (9th Cir. 2022). Such "post hoc" litigation arguments are widely disapproved and routinely rejected by federal courts in ERISA cases. *See id.* at 1186-87 (collecting cases); *Spradley v. Owens-Illinois Hourly Employees Welfare Ben. Plan*, 686 F.3d 1135, 1140-41 (10th Cir. 2012) (holding that administrator could not "treat the administrative process as a trial run" and then "offer a post hoc rationale in district court").

---

[3] The same information must be provided to a claimant whose appeal of an initial adverse determination has been denied. 29 C.F.R. § 2560.503-1(j)(1)-(2).

Cottingim here acknowledges that an Eleventh Circuit panel has -- albeit in an unpublished opinion -- stated that it is "not error" for a district court to consider an administrator's post hoc explanations. *Tippitt v. Reliance Standard Life Ins. Co.*, 276 F. App'x 912, 915 (11th Cir. 2008). But that non-binding ruling means only that consideration of such explanations is "not prohibited." *Scippio v. Fla. Combined Life Ins. Co.*, 585 F. Supp.2d 1317, 1332 n.13 (N.D. Fla. 2008) (discussing *Tippitt*). The *Tippitt* panel did not say that judicial consideration of post hoc rationales is *required*. This is reflected in subsequent district court decisions from within the Eleventh Circuit, in which courts have declined to consider an administrator's post hoc arguments. *See, e.g., Lesser v. Reliance Standard Life Ins. Co.*, 385 F. Supp.2d 1356, 1378 n.131 (N.D. Ga. 2019) (noting that court "need not address [administrator's] alternative justification because it was not mentioned in either of the Defendant's denial letters"); *Castanon v. UPS/IBT Full-Time Emp. Pen. Plan*, No. 1:16-cv-621, 2017 WL 4863238, *4, 4 n.2 (N.D. Ga., Aug. 4, 2017) (commenting that *Tippitt*'s permissive approach is "against the great weight of other persuasive outside circuit authority," and declining to consider administrator's "post hoc reasons").

In the present case, ReliaStar relied on post hoc arguments in litigation, and the district court then considered and agreed with ReliaStar's post hoc rationales in granting the company's summary judgment motion. While *Tippitt* indicates that the district court was not prohibited from considering the post hoc arguments in the

court's *de novo* review of the claim, this Court remains equally free to disregard those improper arguments when conducting its own *de novo* review. *See Harris v. Lincoln Nat. Life Ins. Co*., 42 F.4th 1292, 1295 (11th Cir. 2022) (recognizing that *de novo* review means a "fresh, independent determination of the matter at stake") (citation omitted).[4] For the reasons set out below, this Court should decline to consider ReliaStar's post hoc rationales.

ReliaStar notified Cottingim that it was denying his LTD claim because his cognitive test scores were reportedly "within normal limits," meaning that Cottingim did not have a "debilitating neurocognitive disorder" and was therefore not disabled. (DE 23-1, pg. 291-292.) Although ReliaStar's denial letter reproduced the LTD Policy's disability definition, which contains (among many other things) a reference to "appropriate care," the letter **did not include the Appropriate Care Provision.** (*Id.*, pg. 290-293.) Furthermore, the letter made **no other mention of the LTD Appropriate Care Provision**. (*Id.*) The letter also made **no mention of any medical recommendations that Cottingim cease or reduce his consumption of alcohol**. (*Id.*) Indeed, even ReliaStar's subsequent letters denying Cottingim's appeal did not set forth or in any way rely upon the Appropriate Care Provision. (*Id.*; DE 23-1, pg.

---

[4]     Indeed, as this Court further observed in *Harris*, "*de novo* review" is a somewhat misleading term because the court actually renders an "independent *decision*" rather than conduct a true appellate review of another entity's determination. *Id.* at 1296 n.3 (emphasis in original) (citation omitted).

81-84.) Nor did ReliaStar at any point suggest that Cottingim's claim was fabricated or its timing suspicious.

In the district court proceeding, however, ReliaStar changed its tune, contending for the first time that Cottingim had run afoul of the LTD Appropriate Care Provision because his cognitive impairments "may" have been caused by his use of alcohol. (DE 32, pg. 28.) According to the company, Cottingim failed to seek appropriate care because he did not entirely stop drinking before claiming disability. (*Id*.) Cottingim responded that the district court should not consider ReliaStar's post hoc argument, and, alternatively, that the court should reject the argument as wrong on the merits. (DE 38, pg. 9-19.) The district court, however, expressly relied on the Appropriate Care Provision in concluding that Cottingim was not disabled within the meaning of the LTD Policy. (DE 50, pg. 9, 39-40.) Rejecting Cottingim's contention that ReliaStar had failed to timely advise him of any such ground for denying his claim, the district court stated that the "requirement that Plaintiff be under the appropriate care of a doctor was communicated in ReliaStar's denial letters." (*Id.*, pg. 40.)

Again, while it is true that the LTD denial letter contains the phrase "appropriate care" -- albeit buried within the 155-word disability definition -- it neither sets forth the Appropriate Care Provision nor provides any clue whatsoever that the Appropriate Care Provision was a reason for denying Cottingim's LTD

claim. No reader, however perceptive, could reasonably be expected to discern from the letter that ReliaStar had denied the claim based on the Appropriate Care Provision. ReliaStar therefore violated applicable law in two related but distinct ways: first, by failing to inform Cottingim of the reason for the denial of the LTD claim; and second, by failing to identify the relevant plan provision. *See Sellers v. Zurich Am. Ins. Co.*, 615 F. Supp.2d 816, 821 (E.D. Wis. 2009) (ruling that administrator violated ERISA statute and regulation where its denial letter did not "explain how it reached the conclusion nor does it identify the provisions on which [administrator] relied" in denying claim).

Cottingim had no opportunity to appeal the denial of his LTD claim based on the Appropriate Care Provision. Because ReliaStar failed to disclose the provision as a ground for denial, he had no way of knowing he should address it in his appeal, thus subverting the very purpose of the statutory and regulatory notice requirements described above. Cottingim likewise had no idea that ReliaStar viewed the timing of his claim as highly suspicious, meaning he had no opportunity to offer the company any needed explanations before it made its final decision on appeal.

ReliaStar, in its initial LTD denial letter, made a point of telling Cottingim that the letter had provided him with the company's "precise reasons" for denying his claim, as well as the "specific facts" supporting the decision. *See* pg. 16, *supra*. ReliaStar then instructed him to address "these reasons" if he chose to appeal the

denial. *Id*. For the company to later advance *different* reasons in the district court action was litigation by ambush, also known as "sandbagging." *See, e.g., Pike v. Caldera*, 188 F.R.D. 519, 532 n.23 (S.D. Ind. 1999) (collecting cases and observing that "sandbagging" is defined as withholding an argument "until the opposing party does not have an adequate opportunity to respond"). And indeed, the rule against considering an ERISA administrator's post hoc rationale has been adopted by many courts precisely *because* it "prevents the claimant from being 'sandbagged' in litigation." *Collier*, 53 F.4th at 1186 (citation omitted). *See also Lauder v. First Unum Life Ins. Co*., 284 F.3d 375, 382 (2d Cir. 2002) (commenting that consideration of post hoc rationales "raises the concern" that administrators will be incentivized to "try the easiest and least expensive means of denying a claim while holding in reserve another, perhaps stronger, defense should the first one fail").

In presenting to the district court new reasons for the denial of Cottingim's LTD claim, ReliaStar violated the statutory and regulatory requirement that an ERISA claimant must be timely informed of the specific reason(s) for an adverse decision. *See Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 130 (1st Cir. 2004) (holding that administrator "violated ERISA and its regulations by relying on a reason in court that had not been articulated to the claimant" prior to litigation). Cottingim respectfully asks this Court to refrain from rewarding ReliaStar's unlawful conduct by allowing the company to sandbag him with "after-the-fact plan

interpretations devised for purposes of litigation." *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (citation omitted). *See also Doyle v. Nationwide Ins. Companies & Affiliates Emp. Health Care Plan*, 240 F. Supp.2d 328, 347 (E.D. Pa. 2003) (noting that "permitting an administrator's post hoc rationale to prevail ... in federal court would undercut ERISA's requirement that administrators provide specific reasons from the outset when denying a claim").

Just as the Second Circuit in *Lauder* declined to endorse "manipulative strategies" that seek to "take advantage of claimants" via sandbagging, so too should this Court. This Court's *de novo* review should instead "consider only the specific basis on which the plan administrator relied in its administrative denial of benefits." *Spradley*, 686 F.3d at 1141. As set forth in the following section of this Brief, when only ReliaStar's original stated rationales are considered, the company's LTD claim decision was manifestly wrong.

B. ReliaStar's LTD Claim Decision Was "*De Novo* Wrong."

With the Appropriate Care Provision properly disregarded -- and this Court's analysis properly focused on ReliaStar's stated reasons for denying Cottingim's LTD claim -- the Court should conclude that a preponderance of the evidence establishes Cottingim's disability from his regular occupation, thus rendering ReliaStar's decision "*de novo* wrong."

ReliaStar's principal stated reason for denying Cottingim's LTD claim was that his scores on various cognitive tests were generally "within normal limits" or "within the average range." (DE 23-1, pg. 83, 292.) But in the context of a "regular occupation" disability definition, such an analysis "**addresses the wrong question**." *Landeck v. Unum Life Ins. Co. of Am.*, No. 17-cv-3157, 2018 WL 11472373, *8 (N.D. Cal., Oct. 15, 2018) (emphasis added). The dispositive issue in a "regular occupation" case is *not* whether the claimant's cognitive ability "falls within the normal range." *Id*. Rather, it is "whether his cognitive ability has declined such that it limits his ability to perform his regular occupation." *Id*. If the claimant's "normal" or "average" abilities are insufficient to meet the mental demands of their occupation at the relevant time, then the claimant is disabled. *See id.* at *9 (deeming plaintiff disabled from regular occupation); *Lesser v. Reliance Standard Life Ins. Co.*, 385 F. Supp.2d 1356, 1371-72 (N.D. Ga. 2019) (finding software engineer disabled from his occupation notwithstanding his "middling" and "largely normal" cognitive test scores, and explaining that a software engineer must have "far above average" cognitive abilities); *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp.2d 546, 566-67 (W.D. Pa. 2009) (finding plaintiff whose IQ tested in the "average range" to be disabled from her occupation as a financial consultant, which required the "highest level of mental acuity").

As both ReliaStar and the district court have acknowledged, Cottingim's regular occupation as a Vice President of Human Resources, as performed in the

national economy, required a "high" level of aptitude in general learning ability, as well as in verbal and numeric abilities.[5] (DE 50, pg. 20-21.) What neither ReliaStar nor the district has explained, however, is how a person with merely *average* cognitive abilities can adequately perform an occupation which undisputedly has *high* cognitive requirements.

Cottingim respectfully contends that *Murphy v. Cal. Physicians Serv.*, No. 14-cv-2581, 2017 WL 1330636 (N.D. Cal., Apr. 11, 2017), is factually and analytically on point. In *Murphy*, as in the instant case, the plaintiff's pre-disability occupation was "Vice President of Human Resources." *Id.* at *27. As the court noted, this was an "executive position" with "highly cognitive demands." *Id.* at *16. The claim administrator's occupational analysis found that the "cognitive skills" required of a Vice President of Human Resources included the ability to "think creatively, strategically, concretely, and abstractly." *Id.* at *8. According to the occupational analysis, a Vice President of Human Resources was also required (a) to "read, comprehend, and use written materials including graphs, charts and displays," (b) to "think critically and act logically to evaluate situations, solve problems and make decisions," (c) to "understand and solve problems involving analytics," and (d) to "change focus" by "juggling priorities" as needed. *Id.*

---

[5]     ReliaStar's vocational expert used five categories to classify the cognitive demands of Cottingim's occupation: markedly low, low, medium, high, and extremely high. (DE 50, pg. 20.)

The plaintiff in *Murphy*, like Cottingim, sought LTD benefits based on cognitive dysfunction that prevented her from performing her occupational duties. *Murphy*, at *12-13. The claim was denied by the administrator, in part because the plaintiff's scores on recent testing "primarily fell within the average range" and thus allegedly "did not show any severe impairment in cognitive functioning." *Id.* at *17. Commenting that the administrator "should have compared plaintiff's mere average abilities" to the cognitive demands described in the administrator's "own vocational review," the court determined that the plaintiff was "cognitively disabled from performing the duties of her job as a VP of Human Resources." *Id*. at *22-23. The same result should obtain here, for the same reasons.[6]

In concluding otherwise, the district court made factual and logical errors that this Court should not repeat in its own *de novo* review of the claim. The district court found "nothing in the administrative record" indicating that Cottingim's "work performance was previously impacted or his ability to perform his job responsibilities was limited … until two letters were submitted in September 2020 from former co-workers." (DE 50, pg. 37.) As the district court expressly acknowledged, the letters (one of them from Cottingim's long-time direct superior) described the authors' personal observations of "increasing memory lapses and a

---

[6] Although *Murphy* was cited and discussed in detail in Cottingim's dispositive motion below, *see* DE 31 at 22-23, the district court's opinion makes no mention of the case.

decline in [Cottingim's] work performance over the past eighteen months." *Id*. Nevertheless, the district court dismissed the letters as insufficient evidence that Cottingim "was not satisfactorily performing his job" before he ceased working. (*Id*., pg. 37-38.)

In rejecting the letters and the other evidence offered by Cottingim, the district court got it wrong in two critical ways. First, written accounts of contemporaneous personal observations of the claimant -- as provided by colleagues, friends, family members, etc. -- are routinely credited by courts in ERISA disability cases. Second, contrary to the district court's characterization, the administrative record in fact contains ample additional evidence of Cottingim's cognitive decline and resulting inability to meet the demands of his occupation.

(i) *The Evidence from Cottingim's Work Supervisor and Colleague Supports his Disability and Should be Fully Credited.*

An ERISA claim administrator, as this Court has made plain, "cannot ignore uncontradicted record evidence of disability." *Kaviani v. Reliance Standard Life Ins. Co.*, 799 F. App'x 753, 759 (11th Cir. 2020). One type of evidence commonly relied upon in ERISA disability cases is the observations of a claimant's workplace supervisor, work colleagues, and/or friends or family members regarding the effects of the claimant's health condition(s) on his or her functionality and work performance. *See, e.g., Gross v. Sun Life Assur. Co. of Canada*, 734 F.3d 1, 23 (1st Cir. 2014) (citing "letters from [plaintiff's] co-workers" describing her struggles at

work); *Landeck*, *supra* pg. 33, at *8 (crediting "statement from [plaintiff's] co-worker that she had observed a marked decline in [plaintiff's] ability to perform at work").

In the present case, Cottingim's disability claim was supported in part by letters from his work supervisor and a colleague, respectively. The supervisor, Paul Galleberg, attested to the "decline in [Cottingim's] work performance" due to his inability to retain information. (DE 22-1, pg. 561.) Mr. Galleberg described specific remedial measures that he personally took to address this problem, such as requiring Cottingim to repeat things said to him and take notes during discussions. (*Id.*) However, Cottingim's performance continued to decline. (*Id.*)

The colleague, Michael Baer, advised ReliaStar that he and Cottingim had "worked very closely together for five years." (DE 22-1, pg. 562.) As the end of Cottingim's employment with EBL drew nearer, Mr. Baer personally witnessed "alarming" episodes of confusion, memory lapses, and withdrawal from discussions. (*Id.*) Mr. Baer also described Cottingim's failure to complete assignments, in marked contrast to his former "speed and excellence." *Id*.

The evidence furnished by Mr. Galleberg and Mr. Baer consists of exactly the type of contemporaneous workplace observations that are consistently credited by courts in ERISA actions. *See, e.g., Knox v. United of Omaha Life Ins. Co.*, 357 F. Supp.3d 1265, 1276 (N.D. Ga. 2019) (crediting "coworkers' observations" of

plaintiff's "memory loss, difficulties with comprehension and communication, and overall physical and cognitive deterioration"); *Perryman v. Provident Life and Acc. Ins. Co.*, 690 F. Supp.2d 917, 945 n.12 (D. Ariz. 2010) (noting that plaintiff's "concentration and memory-related problems were reported by people who worked with her, such as her supervisor"). ReliaStar, however, simply ignored this evidence, which was improper under ERISA. *See Zurndorfer v. Unum Life Ins. Co. of Am.*, 543 F. Supp.2d 242, 260 (S.D.N.Y. 2008) (reversing decision of administrator that wrongly "refused to consider evidence from … two of [plaintiff's] colleagues" regarding her difficulties at work); *Learn v. Lincoln Nat. Life Ins. Co.*, --- F. Supp.3d ---, No. 6:20-cv-60, 2024 WL 1183676, *18 (W.D. Va., Mar. 19, 2024) (reversing claim decision and criticizing administrator that "completely ignored" affidavits from "friends and colleagues" describing plaintiff's impairments).

In dismissing the accounts of Mr. Galleberg and Mr. Baer, the district court noted that "neither Baer nor Galleberg are employed any longer at EBL." (DE 50, pg. 38.) Although the district court attributed "significance" to the latter fact (*id.*), it did not explain the alleged significance. Cottingim respectfully contends that the current employment status of Mr. Galleberg and Mr. Baer has no relevance whatsoever to the credibility of their reported observations of Cottingim during the period of time that each man worked directly with him. (*Id.*) The district court further observed that "no employment records have been submitted evidencing negative

performance reviews, reprimands, or any other documentation from EBL indicating Cottingim was not satisfactorily performing his job." (*Id.*) The LTD Policy, however, does not require such documentation as a condition of benefits, meaning that neither ReliaStar nor the district court was free to impose such a requirement.

When the relevant rights and responsibilities of ERISA plan participants and administrators are set forth in plan documents, the "plan language controls." *Meadows v. Cagle's, Inc.*, 954 F.2d 686, 691 (11th Cir. 1992).[7] Consequently, as this Court has made clear, an ERISA administrator is not permitted to impose "new requirements" for benefits that are not stated in the plan. *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1484 (11th Cir. 1995). *Accord Saffle v. Sierra Pacific Power Co. Bargaining Unit LTD Plan*, 85 F.3d 455, 459-60 (9th Cir. 1996) (citing *Florence Nightingale* and holding that an administrator cannot "rewrite the plan" in a manner that "effectively imposes a new requirement" for disability benefits). Federal courts are similarly "not at liberty to rewrite the terms of an ERISA plan." *Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 215 (3d Cir. 2001). This Court should therefore decline to create a new rule holding that testimony regarding workplace observations of a claimant's behavior and job performance must be accompanied by employment records

---

[7]     Where, as here, ERISA-regulated benefits are provided through an insurance policy, the policy is a plan document. *Cinelli v. Sec. Pacific Corp.*, 61 F.3d 1437, 1441 (9th Cir. 1995); *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 856 (4th Cir. 1994).

documenting "negative performance reviews" or formal "reprimands" in order to support a claim for benefits under an ERISA-governed disability policy.

The uncontradicted information provided by Mr. Galleberg and Mr. Baer is probative evidence of Cottingim's declining work performance as he remained on the job in 2019-2020. Accordingly, this Court should, unlike the district court, give that evidence substantial weight in its *de novo* review of the claim. *See Mindt v. Prudential Ins. Co. of Am.*, 322 F. Supp.2d 1150, 1161 (D. Or. 2004) (awarding LTD benefits on *de novo* review where plaintiff's work colleague, who had "observed him … for five years," described the "progressive nature of his difficulties").

*(ii) Other Evidence Overwhelmingly Establishes Disability.*

In opposing Cottingim's summary judgment motion, ReliaStar relied in part on treating neurologist Hunter's Attending Physician's Statement ("APS") from August 2020 (the month in which Cottingim ceased work). (DE 39, pg. 17.) According to ReliaStar, the APS supported the claim denial because Dr. Hunter had allegedly "left the section for cognitive limitations blank." (*Id.*) The district court, agreeing with ReliaStar, subsequently emphasized the "lack of restrictions or limitations noted by Dr. Hunter in his August 2020 attending physician statement submitted in support of Cottingim's disability claims." (DE 50, pg. 39.)

Crucially, however, the APS form -- which was supplied to Cottingim by ReliaStar -- *did not request any information regarding Cottingim's cognitive*

*abilities or impairments*. *See* pg. 8, *supra*. Rather, the form focused on his ability to perform various physical and motor functions such as lifting, bending, sitting, standing, climbing, squatting, crawling, and using his upper extremities. *Id*. As a matter of common experience and common sense, a person's ability to perform physical activities has no relevance to a disability claim based on cognitive dysfunction. *See Chapin v. Prudential Ins. Co. of Am*., No. 2:19-cv-1256, 2021 WL 1090749, \*10 (W.D. Wash., Mar. 22, 2021) (reasoning that physical activities such as hiking and skiing were "irrelevant to Plaintiff's claim that he was unable to perform his job due to cognitive impairment"). Furthermore, the inadequacy of the Attending Physician's Statement was specifically noted in the record by Dr. Hunter, who described himself as "disappointed" that the form did not "focus on cognition." (DE 22-1, pg. 556.) The district court's interpretation of the APS form as somehow undermining or discrediting Cottingim's claim of cognitive disability was, therefore, simply mistaken reasoning. This Court's *de novo* analysis should not repeat or ratify the district court's logical error.

After apprising ReliaStar of the inadequacy of the APS form, Dr. Hunter furnished the company with detailed information concerning Cottingim's medical history, his neurological diagnosis, and the precise manner in which his condition affected his brain and degraded his cognitive functioning. *See* pg. 9-10, *supra*. Because Cottingim's pre-illness intellect was in the "superior range," his subsequent

"low average" scores represented a "major decline" in his abilities over a period of approximately two years.[8] (DE 22-1, pg. 557.)

ReliaStar is expected to contend that Cottingim's pre-illness intellect was actually merely average, and that he therefore did not experience any cognitive decline at all. Any such argument should be rejected as illogical and contrary to the evidence. For one thing, as noted previously, ReliaStar's *own occupational analysis* found that Cottingim's occupation required *high* -- not average -- aptitude in multiple cognitive domains. *See* pg. 5, *supra.* Given the "speed and excellence" of Cottingim's job performance prior to his illness (DE 22-1, pg. 562), he plainly had the requisite high intelligence before his decline commenced. *See Brown v. Unum Life Ins. Co. of Am.*, 356 F. Supp.3d 949, 969 (C.D. Cal. 2019) (finding cognitive decline "highly likely" in view of plaintiff's "pre-illness excellence" in her "demanding, executive-level usual occupation," and deeming plaintiff disabled from occupation). Cottingim's cognitive decline is, moreover, objectively documented by various test scores reflecting high intellectual abilities in the years prior to 2019, after which his scores were consistently average at best. *See* pg. 11-15, *supra.* Indeed, as recently as April 2018, a General Intelligence Assessment showed that

---

[8] While ERISA administrators are not required to accord automatic deference to a treating physician's medical opinion, they cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disab. Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965 (2003).

his overall intellectual abilities were at that time in the "top 14% of the norm range." (DE 22-1, pg. 564.)

In October 2019, however, examining neuropsychologist Michele York diagnosed Mild Neurocognitive Disorder. (DE 22-1, pg. 658.) Importantly, a diagnosis of "mild" neurocognitive disorder is a medical term of art that "does **not** indicate 'mild' symptoms." *Ertel v. Saul*, No. 18-9603, 2019 WL 3947092, *5 (C.D. Cal., Aug. 21, 2019) (emphasis added) (citing DSM-5).[9] Instead, it indicates the "**loss of previously acquired cognitive functions**, including complex attention, learning and memory, executive ability, language, visual-constructional-perceptual ability, and social cognition." *Id*. (emphasis added) (citing M. Ganguli, Classification of Neurocognitive Disorders in DSM-5: A Work in Progress (2011)). *See also Dunn v. Saul*, 794 F. App'x 519, 523 (7th Cir. 2019) (citing DSM-5 and recognizing that mild neurocognitive disorder causes "reduced cognitive efficiency" and "lessened ability to perform usual activities").

Concluding that Cottingim's diagnosed cognitive disorder was not disabling, the district court reasoned that Cottingim had "continued to work" through the end of 2019 and into 2020. (DE 50, pg. 38.) As this Court has recognized, however,

---

[9]     The <u>Diagnostic and Statistical Manual of Mental Disorders, 5th Edition</u> ("DSM-5"), published by the American Psychiatric Association, is widely recognized as "the authoritative guide for healthcare professionals" with respect to diagnostic classifications. *Sanborn v. Comm'r of Soc. Sec.*, No. 16-4408, 2017 WL 4842373, *9 (D.N.J., Oct. 25, 2017).

disability under an ERISA plan is "**not disproved by the fact that a claimant continues to work**." *Kaviani*, 799 F. App'x at 757 (emphasis added). Any such rule would "unfairly punish individuals who test their limitations and attempt to keep working before seeking benefits." *Seitz v. Metro. Life Ins. Co*., 433 F.3d 647, 651 (8th Cir. 2006). *See also Hawkins v. First Union Corp. LTD Plan*, 326 F.3d 914, 918 (7th Cir. 2003) (holding that a disabled employee "should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working"). In *Hawkins*, for example, the administrator contended that the claimant could not have been disabled because he had "worked between 1993 and 2000 … and there is no indication that his condition worsened over this period." *Id*. The Seventh Circuit firmly rejected the administrator's "bad argument," *id.*, and this Court should do likewise. *See also Seitz*, 433 F.3d at 651 (rejecting administrator's argument that claimant had "continued to work" following his diagnosis and his "condition did not significantly change" before he ultimately ceased working).

An ERISA administrator "cannot rely on unproven assumptions that are contradicted by the record, no matter how strongly it believes those assumptions to be true." *Nebesny-Fender v. Am. Airlines, Inc.*, 818 F. Supp.2d 1319, 1332 (S.D. Fla. 2011). Here, extensive record evidence establishes a cognitive decline that rendered Cottingim unable to perform his occupational duties at the time he claimed LTD

benefits. While ReliaStar might believe that Cottingim somehow roped multiple colleagues and physicians into an elaborate scheme to trick the company, any such belief is rank speculation, which this Court should reject. *See Kaviani*, 799 F. App'x at 758 (ruling that district court was "correct to reject [administrator's] speculation" about plaintiff's motives for resigning, in favor of "evidence showing that [plaintiff] was experiencing debilitating disability in the period leading up to his resignation"). Based on the evidence, this Court should conclude that ReliaStar's decision to deny Cottingim's LTD claim was "*de novo* wrong."

C. Alternatively, ReliaStar's Post Hoc Rationales Should be Rejected as Meritless.

If this Court is inclined to consider ReliaStar's post hoc argument concerning the timing of Cottingim's claim, it should reject that argument as meritless for the reasons stated in the preceding section of this Brief. In addition, if this Court is inclined for any reason to consider ReliaStar's post hoc argument based on the Appropriate Care provision, then the Court should reject that argument on the merits as well. The district court, relying on *Mack v. Metro. Life Ins. Co.*, 246 F. App'x 594 (11th Cir. 2007), ruled that the Appropriate Care Provision precluded benefits because he failed to comply with "recommendations … to obtain treatment related to his alcoholism." (DE 50, pg. 39-40.) But in actuality, the reasoning of *Mack* aptly illustrates the inapplicability of the provision to Cottingim.

In *Mack*, the panel explained that the "undoubted purpose" of such a provision is that the administrator "wants its claimants to get well as soon as possible so it can stop paying them benefits, and it therefore requires them to undergo the treatment most likely, under all the circumstances, to get them healthy." 246 F. App'x at 596. The objective, in other words, is to "encourage claimants to undertake measures to restore their health." *Id*. at 597.

But Cottingim was not, and is not, under any circumstances, going to get "well" or "healthy." Cottingim's disabling condition is cognitive impairment resulting from -- as explained by his treating neurologist, Dr. Hunter -- "small vessel ischemic disease," a neurological disorder characterized by "hundreds of tiny cerebral infarcts" which act to "compromise attention, concentration, and processing speed."[10] (DE 22-1, pg. 557.) Even assuming *arguendo* that alcohol played some role in the development of Cottingim's neurological disorder, any abstention from alcohol at the time he claimed disability would not have ameliorated his brain disease or restored any of his lost cognitive function. This reality is made clear by Dr. Hunter, who explained that "sobriety will not restore [Cottingim's] cognitive impairment" because his brain damage is "permanent." (*Id.*, pg. 557.) Indeed, no improvement was expected even with "perfect risk factor control" going forward.

_____

[10]    ReliaStar's reviewing psychologist, Dr. Ross, concurred that Cottingim's likely neurocognitive disorder was "consistent with [his] history of small vessel ischemic disease." (DE 23-1, pg. 136.)

(*Id.*) On the contrary, Dr. Hunter anticipated that Cottingim's cognition would only "further worsen over time, as even with the best of care, he will continue to have diabetes and will develop more infarcts." (*Id.*) As no amount of treatment or care would have mitigated Cottingim's permanent, inexorably worsening brain damage at the time he claimed disability, applying the Appropriate Care Provision to him would not serve the purpose of encouraging disability claimants to get healthy so they can return to work. *See Walke v. Group LTD Ins.*, 256 F.3d 835, 840 (8th Cir. 2001) (rejecting administrator's reliance on similar provision because there was "no evidence that additional doctor visits would have influenced the progression of [plaintiff's] disability"); *Seitz v. Metro. Life Ins. Co.*, No. C-04-1003, 2005 WL 715932, *22 (N.D. Iowa, Mar. 30, 2005), *rev'd on other grounds*, 433 F.3d 647 (8th Cir. 2006) (following *Walke* and declining to apply appropriate-care provision against plaintiff because further treatment "would not have improved his condition").[11]

For the foregoing reasons, even if this Court considers ReliaStar's post hoc arguments, it should still deem the LTD claim decision "*de novo* wrong."

---

[11]     Cottingim was ultimately diagnosed with Alzheimer's disease. (DE 50, pg. 24.)

D.    <u>ReliaStar Did Not Have Discretionary Authority, thus Necessitating
      Reversal of the LTD Claim Denial</u>.

In general, when an ERISA plan grants an administrator discretionary authority to decide claims, the deferential "arbitrary and capricious" standard of judicial review applies instead of non-deferential *de novo* review. *Blankenship*, 644 F.3d at 1355-56. An administrator arguing for the arbitrary and capricious standard has the burden of demonstrating that it applies. *Oliver v. Aetna Life Ins. Co.*, 55 F. Supp.3d 1370, 1378 (N.D. Ala. 2014), *aff'd*, 613 F. App'x 892 (11th Cir. 2015).

The district court, having determined that the challenged claim decision was correct on *de novo* review, concluded that it "need not decide what standard of review applies after step one" of the *Williams/Blankenship* analysis. (DE 50, pg. 32.) The district court did comment, however, that if it were "required to go beyond step one ... the *de novo* standard would likely still apply, because under Texas law, which governs the policies here, discretionary clauses in insurance policies are invalid."[12] (*Id.*, pg. 30.) In this, the district court was correct, as Texas law indeed "prohibits insurers from using discretionary clauses." *Talasek v. Unum Life Ins. Co. of Am.*,

---

[12]    The LTD Policy specifies Texas as the "governing jurisdiction." (DE 22-1, pg. 764.) ERISA preempts all state laws that, if applied, would "undercut the uniform implementation" of the federal statute. *Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1148 (11th Cir. 2001). The purpose of a contractual choice-of-law provision in the ERISA context is to ensure that "all issues not preempted by federal law are resolved by application of the chosen state's law." *DaimlerChrysler Corp. Healthcare Ben. Plan v. Durden*, 448 F.3d 918, 928 (6th Cir. 2006). The Texas laws banning discretionary clauses have specifically been held *not* to be preempted, and thus to apply in ERISA cases. *See, e.g., Curtis v. Metro. Life Ins. Co.*, No. 3:15-cv-2328, 2016 WL 2346739, *9-10 (N.D. Tex., May 4, 2016).

No. 4:18-cv-3306, 2020 WL 7775450, *5 (S.D. Tex., Dec. 15, 2020) (citing Tex. Ins. Code § 1701.062 and 28 Tex. Admin. Code § 3.1203). ReliaStar therefore lacks discretion, as any language in the LTD Policy that might otherwise be construed as conferring discretion is void as a matter of law. *See Ferrin v. Aetna Life Ins. Co.*, 336 F. Supp.3d 910, 918-19 (N.D. Ill. 2018) (deeming discretionary clause in ERISA-governed disability policy "void" because Texas law operates to "entitle insureds to *de novo* review by courts").

Any finding of discretionary authority on the part of ReliaStar is additionally precluded by the fact that the only language purporting to give ReliaStar such authority is contained in a summary plan description ("SPD") rather than the LTD Policy itself. (DE 23-1, pg. 4.) Statements in an SPD "do not themselves constitute the *terms* of the plan." *CIGNA Corp. v. Amara*, 563 U.S. 421, 438, 131 S.Ct. 1866 (2011) (emphasis in original). Therefore, an SPD cannot confer discretion for ERISA standard-of-review purposes. *See Prichard v. Metro. Life Ins. Co.*, 783 F.3d 1166, 1169-71 (9th Cir. 2015) (following *Amara* and deeming arbitrary and capricious standard inapplicable because "the only document in the record that confers discretionary authority … is the SPD"). This Court should accordingly rule that ReliaStar lacked discretion for that reason as well.

Because ReliaStar lacked discretion, this Court should end its inquiry at the second step and reverse the claim decision as required by this Court's precedent. *See*

*Blankenship*, at 1355 (holding that reversal is required if administrator's decision was "*de novo* wrong" and the administrator lacks discretion).

### E. An Award of LTD Benefits is the Appropriate Remedy.

In *Spradley*, *supra* page 26, the administrator "gave a reason for denying benefits that was simply incorrect," and then later tried to "come up with a more plausible reason" in litigation. 686 F.3d at 1142. In such a case, the Tenth Circuit reasoned, an administrator should not be afforded the opportunity to "rely on new grounds for denial in this litigation or in any further administrative proceeding." *Id*. The appellate court, having "rejected the sole basis on which the administrator grounded its denial" of the claim, therefore deemed the Plaintiff entitled to an award of disability benefits -- as opposed to a remand for any further proceedings -- and directed judgment to be entered in favor of the plaintiff. *Id*. at 1142-43.

In the present case, ReliaStar's principal stated reason for denying the LTD claim -- *i.e.*, Cottingim's "normal" or "average" cognitive test scores -- was wrong. *See* pg. 22-24, *supra*. Because those scores, together with the other evidence detailed above, establish Cottingim's inability to perform his occupational duties, this Court should direct the entry of judgment in favor of Cottingim for LTD benefits through the date of judgment. *See Billings v. Unum Life Ins. Co. of Am.*, 459 F.3d 1088, 1096 (11th Cir. 2006) (affirming LTD benefits award through date of judgment and rejecting argument that a plaintiff is "required to continue to present evidence of an

on-going disability throughout trial and the date of judgment in order to ensure an award of disability benefits through such date"). The district court should further be directed to entertain a motion by Cottingim for attorney's fees and prejudgment interest.[13] *See Spradley*, 686 F.3d at 1143.

## II. The Court Should Deem Cottingim Entitled to STD Benefits.

As with his LTD claim, ReliaStar's denial of Cottingim's STD claim was based mainly on his normal/average cognitive test scores. *See* pg. 11, 15, *supra*. As detailed above, those test sc5ores are in fact evidence of disability, which is established through other evidence as well. *See* pg. 24-44, *supra*. This Court should accordingly conclude that ReliaStar's STD determination was *de novo* wrong, and that ReliaStar lacked discretionary authority, thus entitling Cottingim to an award of benefits in the maximum amount.[14] *See* pg. 48-50, *supra*.

---

[13]     ERISA authorizes a discretionary award of attorney's fees to either party at the conclusion of a benefits action. 29 U.S.C. § 1132(g)(1).

[14]     The STD Policy contains a "regular and appropriate care" provision that is similar to the Appropriate Care Provision. (DE 22-1, pg. 12, 23.) In view of the purposes of such a provision, *supra* pg. 45-47, the Court should deem it inapplicable to Cottingim's STD claim.

## CONCLUSION

WHEREFORE, the Court should (1) reverse the judgment entered below as to LTD benefits with instructions to enter judgment in favor of Cottingim, (2) reverse the judgment entered below as to STD benefits with instructions to enter judgment in favor of Cottingim, and (3) require the district court to entertain motions for attorney's fees and prejudgment interest.

Dated: July 24, 2024

Respectfully submitted,

/s/ Stephen Jessup
Jerel C. Dawson
Stephen Jessup
Attorneys Dell & Schaefer Chartered
2625 Weston Road
Weston, Florida 33331
(954) 620-8300

*Attorneys for Plaintiff-Appellant*

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, I certify that this brief contains no more than 14,000 words. Based on the word count of the word processing system used to prepare this Brief, the word count, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), is 11,921.

I also certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced font that includes serifs using Microsoft Word, Times New Roman, 14 point.

By:  <u>/s/ Stephen Jessup</u>
      Stephen Jessup

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Brief for Plaintiff-Appellant to be

served on counsel for Defendant-Appellee via Electronic Mail generated by the

Court's electronic filing system (CM/ECF) on this 24th day of July, 2024:

> WENDY L. FURMAN
> DANIELLE S. PLOSHNICK
> MCDOWELL HETHERINGTON LLP
> 2385 NW Executive Center Drive, Suite 400
> Boca Raton, Florida 33431
> (516) 994-4311
> wendy.furman@mhllp.com
> danielle.ploshnick@mhllp.com
> *Attorneys for Defendant-Appellee*

By:    /s/ Stephen Jessup
       Stephen Jessup